**FILED**

SEP 2 9 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ___TCM___
                              DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

UNITED STATES OF AMERICA,               §
                                        §
                    Plaintiff,          §
                                        §
v.                                      §       **CIVIL NO. SA-19-CV-00586-OLG**
                                        §
CHENGYU WANG,                           §
                                        §
                    Defendant.          §

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a denaturalization proceeding in which Plaintiff United States of America seeks to revoke Defendant Chengyu Wang's citizenship in a four-count complaint alleging that Wang's naturalization was illegally procured and that his United States citizenship was procured through concealment of a material fact or willful misrepresentation. (*See generally* Gov.'s Compl., Dkt. No. 1.) The Court held a three-day bench trial, after which the parties filed amended proposed findings of fact and conclusions of law. (*See* Dkt. Nos. 118, 121-1, 121-2.)

Accordingly, pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the instant findings and conclusions with respect to the Government's complaint against Wang. In sum, the Government did not prove by clear and convincing evidence that Wang's naturalization or citizenship was illegally procured by him.

The Court's Findings of Fact and Conclusions of Law are enumerated below. These Findings and Conclusions are based on a careful examination of the parties' exhibits and testimony presented at trial. To the extent necessary, all Findings of Fact that are labeled Conclusions of Law should also be considered Findings of Fact, and vice versa.

**TABLE OF CONTENTS**

FINDINGS OF FACT ................................................................................................. 3

    Military Accessions Vital to the National Interest Program ............................... 3

    Chengyu Wang ................................................................................................... 4

    Wang Begins Process to Enlist Under MAVNI Program ................................... 5

    Standard Form 86 .............................................................................................. 7

    Form DS-160 .................................................................................................... 11

    Enlistment into the Army ................................................................................. 13

    Forms N-426 and N-400 .................................................................................. 14

    USCIS Interview .............................................................................................. 15

    MAVNI Counterintelligence Interviews ......................................................... 20

    Army Referral to FBI ...................................................................................... 24

    Army Administrative Separation Board ........................................................... 25

    This Proceeding .............................................................................................. 27

CONCLUSIONS OF LAW .................................................................................... 30

    COUNT I — ILLEGAL PROCUREMENT OF NATURALIZATION – Membership in
    Proscribed Organization ...................................................................................... 31

        Applicable Law ............................................................................................. 31

        Conclusions .................................................................................................. 33

    COUNT II — ILLEGAL PROCUREMENT OF NATURALIZATION – Lack of Good Moral
    Character: False Testimony .................................................................................. 33

        Applicable Law ............................................................................................. 33

        Conclusions .................................................................................................. 35

    COUNT III — ILLEGAL PROCUREMENT OF NATURALIZATION – Lack of Good Moral
    Character: Unlawful Acts ..................................................................................... 35

        Applicable Law ............................................................................................. 35

        Conclusions .................................................................................................. 36

    Count IV — PROCUREMENT of UNITED STATES CITIZENSHIP BY CONCEALMENT
    OF A MATERIAL FACT OR WILLFUL MISREPRESENTATION ....................... 38

        Applicable Law ............................................................................................. 38

        Conclusions .................................................................................................. 39

CONCLUSION ....................................................................................................... 39

## FINDINGS OF FACT

### MILITARY ACCESSIONS VITAL TO THE NATIONAL INTEREST PROGRAM

1.    The Military Accessions Vital to the National Interest (MAVNI) program is a Department of Defense recruitment program authorized under 10 U.S.C. § 504(b)(2).[1]

2.    MAVNI is a program that allows certain non-citizens legally present in the United States to join the U.S. armed forces in exchange for immediate eligibility for U.S. citizenship.[2]

3.    The MAVNI program expanded military recruiting to certain legally present non-citizens who were not lawful permanent residents and who were either licensed health care professionals in critically short specialties or who spoke one of forty-four strategic languages.[3]

4.    One purpose of the MAVNI program was to "help the Army to maintain a constant state of readiness in strategic language capabilities."[4]

5.    Naturalization under the MAVNI program is authorized under 8 U.S.C. § 1440(a), which provides that individuals who serve in the armed forces during a time period of military hostilities "may be naturalized . . . at the time of enlistment."[5]

6.    A MAVNI enlistee must apply for naturalization through USCIS and must meet all requirements for naturalization imposed by the statute under which he applies for naturalization (*e.g.*, 8 U.S.C. § 1440).[6]

7.    MAVNI soldiers are not required to hold lawful permanent residence (LPR) status before naturalizing but must be present in the United States pursuant to admission in a non-immigrant status.[7]

8.    MAVNI applicants for naturalization must submit a Form N-426, which verifies the applicant's honorable service and is signed by a certifying military official.[8]

9.    In 2016, the Department of Defense (DOD) implemented "additional and retroactive security protocols that all MAVNI applicants must satisfactorily complete."[9]

**CHENGYU WANG**

10.    Chengyu Wang is a naturalized United States citizen.[10]

11.    Wang was born in 1990 in the City of Dalian in the Liaoning province of China. He is the only child of Binhua Liang (mother) and Yu Wang (father).[11]

12.    When Wang was approximately fourteen or fifteen, he was informed by a teacher that he was a member of the Communist Youth League (CYL).[12]

13.    As a middle-school student in China, Wang does not remember joining the CYL but remembers that a teacher told him he was a member.[13]

14.    Wang told his parents that he did not believe in the central tenets or ideology of the CYL but did not tell anyone outside of his family because "that would be considered as suicide in Chinese society."[14]

15.    Professor Shambaugh stated on direct examination that membership in the CYL was "strongly encouraged." However, in his written expert report he stated that joining was mandatory.[15]

16.    Wang attended Zhejiang University in China from September 2009 through June 2013.[16]

17.    During his freshman year at Zhejiang University, Wang applied to join the Chinese Communist Party (CCP).[17]

18.    Applying to join the CCP was routine and mandatory at Zhejiang University.[18]

19.    Wang's CCP application paperwork was not processed until his junior year at Zhejiang University.[19]

20.    During his senior year, when the CCP was willing to proceed with his application, Wang declined to continue with the application process because he was going to undertake studies in the United States.[20]

21.     Wang is not and has never been a member of the CCP.[21]

22.     In 2013, following his graduation from Zhejiang University, Wang came to the United States to pursue a graduate degree at Brown University in Providence, Rhode Island.[22]

23.     On August 29, 2013, Wang was admitted to the United States on an F-1 student (non-immigrant) visa to study the English language at Brown University.[23]

24.     Pursuant to his F-1 visa, Wang was allowed to stay in the United States for the "duration of status" (D/S).[24]

25.     Wang's student visa expired on May 27, 2014; however, Wang was allowed to lawfully stay in F-1 status so long as he maintained a full course of study at Brown.[25]

26.     On May 24, 2015, Wang graduated from Brown University with a master's degree in English.[26]

27.     Wang thereafter remained in F-1 status with an optional practical training (OPT) recommendation.[27]

28.     His OPT remained valid through January 30, 2016.[28]

**WANG BEGINS PROCESS TO ENLIST UNDER MAVNI PROGRAM**

29.     In or around August 2015, Wang inquired about the MAVNI program at the recruiting station in Keene, New Hampshire.[29]

30.     Wang worked with military recruiter Sergeant Zachary Derrick, who reported directly to the station commander, Sergeant Brennan Marte.[30]

31.     The recruiting station was expected to enlist a minimum number of new recruits each month, though this was not a strict quota.[31]

32.     On September 3, 2015, Wang executed a "Letter of Intent to Enlist in the U.S. Armed Forces Under the MAVNI Program and Determination That Applicant's Enlistment Is Vital

to the National Interest" (Letter of Intent).[32]

33.    By executing the Letter of Intent, Wang (1) authorized U.S. Citizenship and Immigration Services (USCIS) to release any immigration status or other information that the Department of Defense required to determine his eligibility for military service and (2) agreed that he intends to enlist in the U.S. Armed Forces upon successful completion of the application process.[33]

34.    On October 13, 2015, Wang, Sergeant Marte, and Sergeant Derrick signed a document entitled "Military Accessions Vital to the National Interest (MAVNI) Information Paper" (MAVNI Information Paper).[34]

35.    This form recommends that MAVNI enlistees stay inside the U.S. between the time when they sign the enlistment contract and when they ship to basic training.[35]

36.    On October 20, 2015, Wang executed a form entitled "Statement for Enlistment" into the Delayed Entry Program (DEP).[36]

37.    The form's stated purpose provides, "Basic form used to record contractual obligations to enlistees. Guarantees and annexes enlistment contract."[37]

38.    In the Statement for Enlistment, Wang acknowledged that he was obligated to serve a total of eight (8) years in the U.S. Armed Forces and that "fulfillment of this obligation begins on the date of enlistment into the [DEP]."[38]

39.    Wang also acknowledged that he had "been assured of attending the School course for . . . Heath Care Specialist."[39]

40.    Wang also acknowledged that the "date of [his] enlistment into the Regular Army [was] scheduled for 02 May 2016."[40]

41.     Time spent in the DEP does not count toward the 8-year commitment to the U.S. Army.[41]

42.     Time spent in the DEP is not paid.[42]

43.     The Army had a right to dismiss Wang at any time while he was in the DEP.[43]

**STANDARD FORM 86**

44.     On the same date, October 20, 2015, Wang signed a Standard Form 86 (SF-86). [44]

45.     An SF-86 is "used by the United States (U.S.) Government in conducting background investigations, reinvestigations, and continuous evaluations of persons under consideration for, or retention of, national security positions as defined in 5 C.F.R 732, and for individuals requiring eligibility for access to classified information under Executive Order 12968."[45]

46.     Although the SF-86 states that "[p]roviding this information is voluntary," the SF-86 mandates that "[i]t is imperative that the information provided be true and accurate, to the best of your knowledge."[46]

47.     A person filling out an SF-86 is warned that "knowingly falsifying or concealing a material fact is a felony which may result in fines and/or up to five (5) years in prison."[47]

48.     Recruiters "build" the SF-86—a large monstrosity filled with government speak—with the recruits.[48]

49.     The SF-86 is a form designed for U.S. citizens and residents; there are several questions that presume an applicant is residing in the U.S.[49]

50.     The SF-86 contains legal terms that would be confusing for most civilians; it is not unusual for recruiters to have to explain questions on the form.[50]

51.     While the form asks whether a recruit was ever court martialed or in a disciplinary process, it would be rare for a recruit to understand what that meant.[51]

52.     It would also be rare for a recruit to know what a "UCMJ" or "mast" meant.[52]

53.     The form instructs recruits to use "location codes" to fill out the form. However, the form does not explain what those are.[53]

54.     Instructions regarding "public burden information" are usually not understood by recruits.[54]

55.     On page ten, the form asks the recruit to provide "APO FPO," but most recruits do not know what that means.[55]

56.     18 U.S.C. § 1001 is mentioned on the form, but most civilians do not know what 18 U.S.C. § 1001 means. Sergeant Derrick himself was unable to recall verbatim what it refers to.[56]

57.     He also did not know what an Article 135 Code of Inquiry was in reference to, even though it was asked about the SF-86 form.[57]

58.     The SF-86 form also contains internal inconsistencies. For example, it requires the original to be signed and dated in ink, but the Army no longer requires an ink signature.[58]

59.     In short, the SF-86 describes requirements that are not actually required, necessitating reliance on guidance from recruiters to complete it.[59]

60.     As a recruiter, one of Derrick's duties was to help the recruit understand the SF-86.[60]

### *Wang's SF-86*

61.     In Wang's case, Sergeant Derrick printed out a version of the SF-86 and asked Wang to complete it.[61]

62. Wang wrote on the paper SF-86 that his mother worked for China Shipping and may have included the address as well.[62]

63. Wang did not include his father's employer on the paper SF-86 because he did not know, then or at the time of trial, the answer to that question.[63]

64. Regarding Section 19, Wang asked Sergeant Derrick whether he needed to include the names of everyone he knew in China—which would be hundreds of people.[64]

65. After consulting with Sergeant Derrick, Wang did not include the names of the Chinese foreign nationals with whom he had had close or continuing contact within the last seven years because the list would be exceedingly long.[65]

66. Sergeant Derrick also required Wang to obtain documents as part of the process including his transcript from Zhejiang University—which states that Wang received a credit in military training while in China.[66]

67. The purpose of gathering this information was to put together the SF-86.[67]

68. Once he had filled out the paper copy of the SF-86 to the best of his ability, Wang met with Sergeant Derrick, who inputted Wang's written answers into the Recruiter Zone.[68]

69. Sergeant Derrick was responsible for inputting and did input Wang's forms into the Army's electronic system.[69]

70. Sergeant Derrick gathered documents from Wang, including his social security card, birth certificate, and transcripts from Zhejiang and Brown Universities, to upload into the "Recruiter Zone."[70]

71. Wang's transcript from Zhejiang University clearly states that Wang had received credit for "Military Training."[71]

72.     That Wang received an academic credit for "Military Training" is clearly reflected on his Zhejiang University transcript that he disclosed to Sergeant Derrick and other U.S. Government officials.[72]

73.     Sergeant Derrick inputted Wang's information and documents into an electronic system called "Recruiter Zone" and, subsequently, shredded the hard copy of the SF-86 that Wang had prepared.[73]

74.     The SF-86 built in the Recruiter Zone will electronically project at a Military Entrance Processing Station (MEPS); the SF-86 projected at MEPS is contained in the recruit's personnel file.[74]

75.     Sergeant Derrick agreed that there could be inadvertent mistakes on the SF-86 made either by him or Wang. For example, Wang's A-number is listed as 555-55-555, which Sergeant Derrick said was in error.[75]

76.     Sergeant Derrick further explained that sometimes there are system errors that prevent recruiters from inputting what they were supposed to input.[76]

77.     The SF-86 provides that "[s]ome investigations will include an interview with you as a routine part of the investigative process. The investigator may ask you to explain your answers to any question on the form. This provides you the opportunity to update, clarify, and explain information on your form more completely, which often assists to completing your investigation."[77]

78.     The SF-86 further provides: "You will be provided the opportunity to explain, refute, or clarify any information before a final decision is made, if an unfavorable decision is considered."[78]

79.     Recruits are allowed to amend the SF-86 at any time, including after it is signed.[79]

**FORM DS-160**

80.     Wang asked Sergeants Marte and Derrick if he could travel to China while in the DEP because he remembered that travel was not recommended on the MAVNI Information Paper.[80] *Testimony of Chengyu Wang,* D1:170:11-13.

81.     Although the MAVNI Information paper says that travel is not recommended, you can travel as a MAVNI.[81]

82.     After they received instruction from someone above them stating that Wang was permitted to travel, Sergeant Marte instructed Wang that he was allowed to travel to and from the United States.[82]

83.     On or around November 24, 2015, Wang applied to renew his student visa while he was in the United States by filling out the form DS-160.[83]

84.     Wang truthfully stated that he would submit his finalized application at his visa interview in China.[84]

85.     A question on the DS-160 asks for the applicant's estimated length of stay. To answer the question the applicant is required to select a choice from a dropdown menu.[85]

86.     Wang selected one year because that was the best option available on the Department of State's dropdown menu. The online form application did not allow a place to explain about the DEP or his military commitment.[86]

87.     The DS-160 question regarding the purpose of the trip also requires the applicant to choose from a dropdown menu.[87]

88.     The selection for F-1 student visa holders is "academic or language student." That was what Wang selected.[88]

89.     Wang stated on DS-160 that he was not in the military because he was not yet in the active Army.[89]

90. On or around December 13, 2015, Wang departed the United States for China.[90]

91. In China, Wang appeared before a U.S. consular official for his interview over his application for a visa renewal.[91]

92. The F-1 student visa includes the OPT recommendation, which allows student visa holders to work as part of their educational experience.[92]

93. When Wang appeared at his consular interview, he presented his Form I-20 which stated that he was in OPT through January 2016, which was less than one year.[93]

94. On December 16, 2015, the Department of State issued Wang F-1 visa number 20153497270003, which was affixed to Wang's Chinese Passport.[94]

95. The consular official who granted Wang's visa renewal was fully aware Wang was returning to continue his OPT recommendation.[95]

96. On January 22, 2016, Wang appeared before a Customs and Border Patrol (CBP) officer to apply for admission to the United States on his renewed F-1 visa.[96]

97. That day, the CBP officer admitted Wang and allowed him to stay for the duration of status.[97]

### *Visa Eligibility*

98. At the time that he signed the MAVNI Information Paper, Wang knew the Army recommended that "MAVNI enlistees remain in the United States between the time that they sign their *enlistment contract* and their ship date to Basic Combat Training."[98]

99. Wang read and understood the following warning in paragraph H of the MAVNI Information Paper: "A person who has *enlisted* in the Army under MAVNI is no longer eligible for an F-1 student visa or any other visa that requires the applicant to show 'non-immigrant intent.'"[99]

100. Wang read and understood the following warning in paragraph H of the MAVNI

12

Information Paper: "Thus, if a MAVNI travels outside the US and applies for an F-1 student in order to return, the Department of State will deny the visa application. The MAVNI will likely be unable to return to the United States."[100]

101.    He specifically asked his recruiters if he could travel because he thought travel might conflict with his eligibility to be re-admitted on an F-1 student visa.[101]

102.    Wang followed his recruiters' advice about him being able to travel while in the DEP.[102]

103.    Wang had no intent to deceive the government when he filled out this form. Indeed, he believed that he was acting with express authorization.[103]

104.    When the recruiter gave him "a good to go," Wang made his trip.[104]

105.    Wang applied to renew his visa on November 24, 2015; Wang's F-1 visa was approved and issued to him in China on December 16, 2015; Wang was admitted to the United States on the F-1 visa on January 22, 2016; Wang signed the *Enlistment Contract* on May 2, 2016.[105]

## ENLISTMENT INTO THE ARMY

106.    On the morning of May 2, 2016, Wang executed, by biometrically signing, an "Enlistment/Reenlistment Document" (Enlistment Contract) for the Armed Forces of the United States.[106]

107.    The document's stated principal purpose is "[t]o record enlistment . . . into the U.S. Armed Forces."[107]

108.    By signing the Enlistment Contract, per Section B, Wang agreed to enlist

in the United States Army Reserve *this date* for 8 years and 0 weeks . . . of which 4 years and 0 weeks is considered an Active Duty Obligation, and 4 years and 0 weeks will be served in the Reserve Component of the Service in which I have enlisted. If this is an initial enlistment, I must serve a total of eight (8) years, unless

I am sooner discharged or otherwise extended by the appropriate authority. This eight year service requirement is called the Military Service Obligation. The additional details of my enlistment/reenlistment are in Section C and Annex(es) A.[108]

109.    Wang's Enlistment Contract next states:

I understand that I am joining the DEP. I understand that by joining the DEP I am enlisting in the Ready Reserve component of the United States Army . . . . I understand that I WILL be ordered to active duty unless I report to [Springfield MEPS, Chicopee, MA] by 20160502 0600 for enlistment in the Regular component of the United States Army for not less than 4 years and 0 weeks.[109]

110.    In short, Wang's date of enlistment into the U.S. Army was May 2, 2016.[110]

## FORMS N-426 AND N-400

111.    As a MAVNI enlistee, Wang was required to submit (1) a Form N-426—or "Request for Certification of Military or Naval Service," which is a required military background check—and (2) a Form N-400, or "Application for Naturalization" to USCIS.[111]

### N-426: Background Check

112.    Wang executed the Form N-426 on May 9, 2016.[112]

113.    It was signed by an official with the United States Army certifying to USCIS that Wang was "currently serving honorably" during his current (first) period of military service.[113]

114.    On his Form N-426, Wang wrote "05/02/2016," for the date his (active duty) military service began.[114]

### N-400: Application for Naturalization

115.    Sergeant Derrick was required to include Wang's Form N-400, as part of Wang's MAVNI enlistment or "ship" packet.[115]

116.    The timing was urgent and the process rushed because the paperwork needed to be completed before Wang shipped to basic training.[116]

117.   Sergeant Derrick had never seen a form N-400 before he assisted Wang on his application.[117]

118.   Sergeant Derrick remembers that there were corrections needed on the form that were required to be done urgently.[118]

119.   Sergeant Derrick and Wang texted, emailed, and assumedly talked by phone to discuss this form.[119]

120.   Wang submitted the Form N-400 on May 11, 2016.[120]

## USCIS INTERVIEW

121.   On June 28, 2016, USCIS Officer Brenda Schwartz orally interviewed Wang, under oath, regarding his Form N-400.[121]

122.   Officer Schwartz had adjudicated thousands of naturalization applications between 2004 and 2016, including many MAVNI applications for naturalization.[122]

123.   Officer Schwartz knows a lot about student visas and had adjudicated employment authorizations for F-1 student visa holders who were working on the OPT program.[123]

124.   An interview or examination was required in every naturalization case; a typical MAVNI interview lasts about twenty-five minutes and is not recorded.[124]

125.   At the outset of a MAVNI interview Schwartz asks the applicant to produce birth documents, passports, and entry documentation.[125]

126.   Officer Schwartz did not review every question on the Form N-400 with every applicant. She marked the questions she orally asked during the interview with a slash in red ink next to the question.[126]

127.   Officer Schwartz received "a lot of training" on how to detect fraud, whether it be through evasiveness, mannerism, body language, or other indicators within their paperwork.[127]

128.    When she detects fraud, she "drills down" on whatever the person may be lying about by asking follow-up questions, requiring follow-up interviews, reviewing A-files, verifying entries, taking sworn statements, or requesting additional evidence.[128]

129.    When asked whether Officer Schwartz asked MAVNI applicants if recruiters helped them fill out their N-400s, she responded, "I don't ask that question of each applicant. I have asked it before to figure out what was going on, and I've been told that. But I do not ask that question of every applicant."[129]

130.    MAVNIs, like Wang, had "no" checked on the N-400 to the question about whether they were ever a member of a military unit or whether they ever served in a military unit—even though they were currently in the U.S. military when they prepare the N-400 application.[130]

131.    Officer Schwartz wondered why the MAVNIs were answering this way. "[W]hen we started asking the question in the group, the group explained that that's how they were told to fill their application out by -- and I don't know if it was their drill sergeant or who was in the room. But it probably was the drill sergeant because they fill those applications out when they're in their basic training."[131]

132.    In short, MAVNIs were directed by government officials to provide answers to questions on their N-400s that were not necessarily accurate.[132]

*Wang's Interview*

133.    At the time of Wang's interview, Wang was in the middle of basic training where he was receiving military training and weapons training from the United States Army.[133]

134.    The interview took place at Fort Sill, Oklahoma. Officer Schwartz has no independent memory of Wang's interview.[134]

135.    Wang's interview was not videotaped, and there is no verbatim transcript of that

16

interview. USCIS had the ability to record the interview but chose not to do so.[135]

136.   Interviews were videotaped when there is an indicator of fraud.[136]

137.   Officer Schwartz reviewed the questions on the N-400 regarding Wang's travel outside of the United States.[137]

138.   Officer Schwartz documented in red ink the testimony of the applicant in response to her questions. She placed a red check mark on the Form N-400 when the applicant's testimony at the naturalization interview matched the information in the Form N-400.[138]

139.   She made red slashes on Wang's Form N-400 that indicated that she orally asked the question and Wang orally answered. Absence of a red slash mark means the question was not orally asked.[139]

### Wang's Form N-400 Responses

140.   In Part 12, Question 9A, the Form N-400 asks, "Have you EVER been a member of, involved in, or in any way associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other location in the world?" Wang checked the box marked "No."[140]

141.   There is no red slash next to this question on Wang's Form N-400; therefore, Officer Schwartz did not orally ask this question during Wang's naturalization interview.[141]

142.   Wang was never a member of the CCP.[142]

143.   Wang was never a voluntary, meaningful member of the CYL.[143]

144.   The Government has not alleged Wang's membership in any other organization, association, fund, foundation, party, club, society, or similar group.[144]

145.   In Part 12, Question 10A, the Form N-400 asks, "Have you EVER been a member of, or in any way associated (either directly or indirectly) with . . . [t]he Communist Party?" Wang

checked the box marked "No."[145]

146.    There is a red slash next to this question on Wang's Form N-400; therefore, Officer Schwartz orally asked this question during Wang's interview.[146]

147.    Wang understood an "affiliation" to mean he had worked for the party or been involved in "regular Party activity."[147]

148.    Wang thought an "indirect affiliation" meant, for example, that a person is not a Party member, but works for the Chinese government.[148]

149.    Wang did not believe that his mandatory attendance at CYL events was an affiliation.[149]

150.    Wang also did not believe that applying to join the CCP during his freshman year at Zhejiang University, where it was mandatory to do so, constituted an affiliation with the Communist Party.[150]

151.    In Part 12, Question 19, the Form N-400 asks, "Did you EVER receive any type of military, paramilitary (a group of people who act like a military group but are not part of the official military), or weapons training?" Wang checked the box marked "No."[151]

152.    There is a red slash next to this question on Wang's Form N-400; therefore, Officer Schwartz orally asked this question during Wang's interview.[152]

153.    Wang had no intent to deceive the Government by answering "no"; his transcript from Zhejiang University clearly and fairly indicated that he received credits for a course entitled "Military Training."[153]

154.    Wang did not believe the mandatory military training that he received at Zhejiang University constituted "training" for purposes of this question.[154]

155.    Officer Schwartz did not doubt the veracity of Wang's response, despite knowing

that Wang was contemporaneously receiving basic combat training at the time of the interview.[155]

156.    Officer Schwartz had encountered innumerable MAVNIs actively receiving basic combat training whose Form N-400s reported that they had not received any military or weapons training.[156]

157.    In Part 12, Question 22, the Form N-400 asks, "Have you EVER committed, assisted in committing, or attempted to commit, a crime or offense for which you were not arrested?" Wang checked the box marked "No."[157]

158.    There is a red slash next to this question on Wang's Form N-400; therefore, Officer Schwartz orally asked this question during Wang's interview.[158]

159.    Officer Schwartz knew about Wang's trip to China on December 13, 2015, with a return date on January 22, 2016, and she specifically asked him about it.[159]

160.    She reviewed his passport and the visa he used to enter.[160]

161.    After reviewing this information, Officer Schwartz found no fraud in Wang's entry on the renewed student visa.[161]

162.    Wang's OPT recommendation on his original F-1 visa remained valid when he completed his Form DS-160.[162]

163.    Wang had not yet signed his Enlistment Contract after returning from China and, thus, was not an active MAVNI enlistee when he completed his Form DS-160.[163]

164.    Thus, Wang was not a MAVNI enlistee when he completed his Form DS-160.[164]

165.    Wang did not make false statements on the DS-160.[165]

166.    In Part 12, Question 31, the Form N-400 asks, "Have you EVER given any U.S. Government officials any information or documentation that was false, fraudulent, or misleading?" Wang checked the box marked "No."[166]

167.   *See* Findings, supra, at ¶¶ 158–165.[167]

168.   In Part 12, Question 32, the Form N-400 asks, "Have you EVER lied to any U.S. Government officials to gain entry or admission into the United States or to gain immigration benefits while in the United States?" Wang checked the box marked "No."[168]

169.   *See* Findings, supra, at ¶¶ 158–165.[169]

170.   In Part 13, Question 1, Wang affirmed that he could "read and understand English, and [he had] read and underst[ood] every question and instruction on this application and [his] answer to every question."[170]

171.   Wang could not recall the specific questions asked to him during his brief interview was six years ago.[171]

172.   Schwartz made no change to Wang's answer to the question on the Form N-400 asking about his military and weapons training.[172]

173.   At the end of an interview, Officer Schwartz's standard practice was to sign the Form N-400 indicating that (i) she completed the interview with the applicant;(ii) the applicant reviewed the application for necessary corrections to the Form N-400; and (iii) she witnessed the applicant sign the Form N-400.[173]

174.   On July 5, 2016, USCIS approved Defendant's application for naturalization.[174]

175.   On July 14, 2016, based on his approved Form N-400, Wang was administered the oath of allegiance, admitting him to U.S. citizenship, and was issued Certificate of Naturalization No. 38286991.[175]

## MAVNI COUNTERINTELLIGENCE INTERVIEWS

176.   In early 2017, Army counterintelligence (CI) officers in San Antonio interviewed a large group of MAVNIs.[176]

177.    These extra CI interviews were only for those people who were not natural born U.S. citizens.[177]

178.    Special Agent Neal E. Merchant of the U.S. Army Criminal Investigative Division estimated that they conducted approximately forty CI interviews with MAVNIs.[178]

179.    For the CI interview, Agent Merchant was provided a preset list of questions to ask MAVNIs.[179]

180.    Agent Merchant did not draft the questions and was unaware who did. The questions were general in nature, not tailored to any specific MAVNI.[180]

181.    Prior to interviews, Agent Merchant reviewed the MAVNI's SF-86. However, they had hardly any other documents or completed record checks.[181]

182.    Agent Merchant looked for errors on the soldiers' SF-86s and to see what information may not have been included on their forms.[182]

183.    Agent Merchant recorded the MAVNIs' answers by typing them into a computer; the answers recorded were not verbatim unless they were short.[183]

184.    He also added his own impression under the title "interview notes" after the questions.[184]

185.    The MAVNI was not allowed an opportunity to review Agent Merchant's summary of their responses to the questions.[185]

186.    After the interview was completed, Agent Merchant would summarize the interview in a "report format."[186]

187.    On February 8, 2017, Wang was interviewed by Agent Merchant in connection with his enlistment through the MAVNI program.[187]

188.    As part of the interview process, Wang was required to complete several written

questionnaires. One questionnaire asked about Wang's affiliation with foreign entities, including the Chinese Ministry of Public Service (MPS). Other questionnaires asked about Wang's travel outside the United States; about his relatives and associates and their military/government experience; and about their job title/employer. Another questionnaire asked the same information but in more detail.[188]

189.    Wang completed the forms on February 8, 2017; he filled them out either prior to the start of the interview or during a break.[189]

190.    Wang did so honestly, voluntarily, and on his own without the assistance of any other person.[190]

191.    The questionnaire forms state that those entries with an asterisk relate to information that should have been in the SF-86.[191]

192.    On these forms, Wang voluntarily provided information about his family and foreign contacts, including those affiliated with the Chinese government, those who worked for China Shipping, and those in the Chinese Communist Party.[192]

193.    Wang indicated that his mother worked for China Shipping and his father previously worked for the Department of Transportation.[193]

194.    Wang also voluntarily advised the government he had a relative who was associated with Ke Gong, who Wang volunteered was a member of the Ministry of Public Security (MPS) in China.[194]

195.    Like a lot of the MAVNIs who were interviewed, Wang's CI forms contained information that was not included in the SF-86.[195]

196.    Because recruiters help MAVNI recruits fill out the SF-86, it is important to talk to the recruiter to find out why he or she allowed the MAVNI to answer in this way, but that was not

Agent Merchant's job.[196]

197.    Agent Merchant did not contact the recruiters who helped Wang fill out the SF-86. He did not ask the recruiters about how they told Wang to answer the questions on the SF-86.[197]

198.    The information on these CI forms that Wang filled out supersedes any conflicting information on the SF-86.[198]

199.    No criminal charges were ever filed against Wang relating to any statement he made on the SF-86.[199]

200.    According to Agent Merchant's notes, Wang told Merchant about how he executed the initial application to join the CCP, but it was not processed until his "junior year of college."[200]

201.    Agent Merchant's notes indicate that Wang advised Merchant that he "was never a real member of the party."[201]

202.    Wang explained to Agent Merchant that applying to the CCP was done because "you kind of had to be part of the party to succeed in life, to get a job and what have you."[202]

203.    On June 28, 2017, former DOJ attorney Aram A. Gavoor sent an email to DOD attorney Michael J. Fucci containing the following:

> Following up on our telephone conversation from this morning, I believe that we share an aligned interest in national security and the MAVNI program. My colleagues and I are interested in discussing DOD's views on whether it has identified or wishes to identify persons who naturalized under 8 U.S.C. §§ 1439 (Naturalization through service in the armed forces), 1440 (Naturalization through active-duty service . . .) but are subject to revocation of such naturalization under 8 U.S.C. §§ 1439(f), 1440(c). We would be happy to present to you and your colleagues the particulars of how revocation of naturalization/denaturalization operates, and how we can add value to DOD by protecting the integrity of military naturalization in this manner. To the extent that DOD is receptive to this possibility, please indicate convenient dates and times.[203]

204.    On August 24, 2017, a DOD/DOJ meeting was held where the agencies discussed the MAVNI program and the revocation of citizenship process.[204]

23

**ARMY REFERRAL TO FBI**

205.    In January 2018, FBI Agent Dezern learned about Wang after receiving a referral from the Army to investigate Wang's contacts with the Communist Party.[205]

206.    On December 6, 2018, Wang was interviewed by Special Agents of the Federal Bureau of Investigation.[206]

207.    During his FBI interview with Agent Dezern, Wang explained that he did not believe he received military training in China.[207]

208.    Wang explained to Agent Dezern that the "weapons training" consisted of a member of the Chinese military handing him a loaded gun and showing him where to shoot.[208]

209.    Agent Dezern had never heard of the CYL prior to his investigation into Wang. He did not know that being a member of the CYL is mandatory.[209]

210.    In January 2019, Wang's cellphone was seized pursuant to a search warrant.[210]

211.    Wang's cellphone contained records of WeChat conversations with his mother.[211]

212.    The FBI imaged all of the WeChat messages on Wang's cellphone but did not submit the full WeChat conversations between Wang and his mother which it extracted from his phone.[212]

213.    Government's Exhibits 7 and 21 do not contain the entirety of the messages between Wang and his mother; therefore, the conversations lack context.[213]

214.    Defense expert Professor Dana Scott Bourgerie is a professor at Brigham Young University and an expert on Chinese linguistics.[214]

215.    Chinese is an especially contextual language; word choice and meaning are heavily dependent on the context of the whole conversation that the individuals are having.[215]

216.    Government's Exhibits 7 and 21 are not complete, coherent records of the WeChat conversations between Wang and his mother.

217.    Both exhibits are around thirty pages in length, and the Government offers only two messages in support of its allegations.

218.    The WeChat messages between Wang and his mother were Agent Dezern's only basis for concluding that Wang was a member of the CCP.[216]

219.    The WeChat messages do not establish that Wang was a member of the CCP.

### ARMY ADMINISTRATIVE SEPARATION BOARD

220.    In 2019, the U.S. Army sought to discharge Wang under conditions other than honorable through a litigated proceeding before the Administrative Separation Board (ASB).[217]

221.    For Wang, separation from the Army for reasons other than honorable also meant automatic revocation of his citizenship.

222.    In short, the Government's first effort to denaturalize Wang was before the ASB.[218]

223.    Before the ASB, the Government alleged that Wang should be discharged under the provisions of Army Regulation ("AR") 635-200, Chapter 14-12(c), which provides that a soldier may be discharged for "[c]ommission of a serious military or civil offense, if the specific circumstances of the offense warrant separation and a punitive discharge is, or would be, authorized for the same or a closely related offense under the [Manual for Courts-Martial]."[219]

224.    Specifically, the Government alleged that Wang engaged in the following conduct, which constituted fraudulent enlistment:

> a.   that Wang was affiliated with the Chinese Communist Party (CCP) and misrepresented his affiliation on his naturalization application and throughout the enlistment process;
>
> b.   that Wang received prior weapons and military training and that he misrepresented his training experience on his naturalization application and

throughout the enlistment process;

c.  that Wang maintained loyalties to China and that he misrepresented those loyalties throughout the enlistment process and when he pledged on his naturalization application to take the Oath of Allegiance without mental reservation;

d.  that Wang misrepresented his parent's employment, his family's contacts with the Chinese government, and his voting record in China on his security clearance application; and

e.  that Wang misrepresented his immigrant intent throughout the enlistment process, necessarily calling into question Wang's responses on his 2015 application for a student visa.[220]

225.    On or around April 29, 2019, an adversarial merits hearing was held before the ASB.[221]

226.    The government was represented by U.S Army counsel, referred to as the Board Recorder, who acted as the prosecutor in the proceeding.[222]

227.    In the ASB hearing, the government had a full and fair opportunity to present its evidence.[223]

228.    At the hearing, the evidence the government introduced included the following:

a.  Wang's enlistment contracts;

b.  non-verbatim transcripts from counter-intelligence investigators (CI) of interviews with Wang;

c.  transcripts from FBI interviews with Wang;

d.  extraction reports from Wang's cell phone containing WeChat messages; and

e.   Wang's application for naturalization.[224]

229.   The government relies upon the same evidence in this trial to revoke Wang's citizenship.[225]

230.   Before the ASB, the government called FBI Special Agent Jacob Dezern to provide testimony.[226]

231.   The government relies on the same FBI Special Agent Jacob Dezern's testimony in this trial to revoke Wang's citizenship.[227]

232.   Following the hearing, the ASB found that the Government did not meet the preponderance of the evidence to support a Chapter 14-12(c) separation based on commission of a serious offense, namely fraudulent enlistment, or a separation under other than honorable conditions.[228]

233.   Wang was honorably discharged from the U.S. Army on April 30, 2020.[229]

**THIS PROCEEDING**

234.   On May 31, 2019, the Government initiated the instant denaturalization action by filing its Complaint to Revoke Naturalization pursuant to 8 U.S.C. § 1451(a).[230]

235.   This lawsuit is the Government's second attempt to denaturalize Wang using the same evidence.

236.   The Government's burden of proof is higher in this proceeding than before the ASB.[231]

237.   Before this Court, the Government must establish its allegations by clear and convincing evidence.[232]

238.   Relying on the same evidence presented in the administrative separation proceeding, the Government now alleges that this Court should revoke Wang's naturalization

based on four grounds that are identical to those they could not prove by a preponderance of evidence before the ASB.[233]

239.    Count I asserts that Wang's naturalization was illegally procured because he was a member of a proscribed organization within the ten years preceding the filing of his application for naturalization in violation of 8 U.S.C. § 1424(a)(2). The Government alleges that Wang was a member of or affiliated with the CCP and the CYL.[234]

240.    Count II asserts that Wang's naturalization was illegally procured because he was not of good moral character for the year preceding the filing of his application for naturalization in violation of 8 C.F.R. § 329.2(d) & 8 U.S.C. § 1101(f)(6). The Government alleges that Wang is precluded from establishing that he is a person of good moral character because he provided the following *false testimony* on June 28, 2016, when he was interviewed under oath in connection with his Form N-400, for the purpose of obtaining his naturalization:

   a.   that he had never been a member of or associated in any way with the CCP;

   b.   that he had never received any type of military or weapons training;

   c.   that he had never committed a crime or offense for which he was not arrested;

   d.   that he had never given any U.S. Government officials any information or documentation that was false, fraudulent, or misleading;

   e.   that he had never lied to any U.S. Government officials to gain entry or admission into the United States or to gain immigration benefits while in the United States; and

   f.   that he was willing to take the full Oath of Allegiance to the United States.[235]

241.    Count III asserts that Wang's naturalization was illegally procured because he was not of good moral character for the year preceding the filing of his application for naturalization

in violation of 8 C.F.R. §§ 329.2(d), 316.10(b)(3)(iii). The Government alleges that Wang committed the following unlawful acts on April 27, 2016, and June 28, 2016, in connection with his Form N-400:

    a.  false swearing in an immigration matter, in violation of 18 U.S.C. § 1546(a);

    b.  making false statements, in violation of 18 U.S.C. § 1001; and

    c.  perjury, in violation of 18 U.S.C. § 1621(1).[236]

    242.  Count IV asserts that Wang's United States citizenship was illegally procured by concealment of a material fact or willful misrepresentation in violation of 8 U.S.C. § 1451(a). The Government alleges that Wang concealed and willfully misrepresented the following on his Form N-400 and at his subsequent interview:

    a.  that he had never been involved in, or in any way associated with any association, fund, foundation, party, club, society, or similar group in the United States or in any other location in the world, when he had been a member of the CYL and the CCP;

    b.  that he had never been a member of or associated in any way with the Communist Party, when he had been a member of the CYL and the CCP;

    c.  that he had never received any type of military or weapons training, when he had received two weeks of military and weapons training from the People's Liberation Army;

    d.  that he had never committed a crime or offense for which he was not arrested, had never given any U.S. Government officials any information or documentation that was false, fraudulent, or misleading, and had never lied to any U.S. Government officials to gain entry or admission into the United States

29

or to gain immigration benefits while in the United States, when he had committed multiple acts of providing false statements under oath in his SF-86 and his Form DS-160;

e. that he was willing to take the full Oath of Allegiance to the United States, when he had mental reservations or a purpose of evasion with respect to his disassociation and renunciation of loyalty to China and his willingness to bear arms on behalf of the United States if required to do so by law.[237]

243. The Government relies on an affidavit executed by Agent Dezern attached to its complaint to show good cause for Count IV of this action.[238]

244. Counts II-IV, in essence, allege that Wang should be denaturalized for a series of misrepresentations he allegedly made in connection with his application for naturalization, his security clearance application with the U.S. Army, and his application for a student visa in 2015.[239]

## CONCLUSIONS OF LAW

1. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1345.

2. Venue is proper pursuant to 8 U.S.C. § 1451(a) and 28 U.S.C. § 1391.

3. No noncitizen may be naturalized "unless all statutory requirements are complied with." *United States v. Ginsberg*, 243 U.S. 472, 474-75 (1917); *see also Tutun v. United States*, 270 U.S. 568, 578 (1926) ("The opportunity to become a citizen of the United States is said to be merely a privilege, and not a right.").

4. The Supreme Court has underscored that "[t]here must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." *Fedorenko v. United States*, 449 U.S. 490, 506 (1981); *see also id.* (A noncitizen "who seeks political rights as a member of this Nation can rightfully obtain them only upon the terms and conditions specified

by Congress.") (quoting *Ginsberg*, 243 U.S. at 474)).

5.    8 U.S.C. § 1451(a) provides United States attorneys with authority to bring an action to revoke a person's citizenship if the "certificate of naturalization w[as] illegally procured or w[as] procured by concealment of a material fact or by willful misrepresentation."

6.    The government carries a "heavy burden" in this case. *Costello v. United States*, 365 U.S. 265, 269 (1961).

7.    The government is asking for an extreme measure, as "once citizenship has been acquired, its loss can have severe and unsettling consequences." *Fedorenko*, 449 U.S. at 505.

8.    The Supreme Court "has long recognized the plain fact that to deprive a person of his American citizenship is an extraordinarily severe penalty." *Klapprott v. United States*, 335 U.S. 601, 612 (1949).

9.    The government must produce "clear, unequivocal, and convincing evidence" that the naturalization was either illegally procured or obtained by concealment of a material fact or by willful misrepresentation. *Kungys,* 485 U.S. at 781 (1988); *Schneiderman v. United States*, 320 U.S. 118, 123 (1943).

10.    The government bears the burden to prove its denaturalization case by "clear, unequivocal, and convincing" evidence, which must "not leave the issue in doubt." *Fedorenko*, 449 U.S. at 505 (internal quotations omitted).

## COUNT I — ILLEGAL PROCUREMENT OF NATURALIZATION – MEMBERSHIP IN PROSCRIBED ORGANIZATION

### APPLICABLE LAW

11.    Under 8 U.S.C. § 1424(a)(2) & (c), no person shall be naturalized as a citizen of the United States who, within the ten years preceding the filing of the application for naturalization, was a member of or affiliated with "(D) the Communist or other totalitarian party . . . of any foreign

state, or of any political or geographic subdivision of any foreign state; [or] (E) any section, subsidiary, branch, affiliate, or subdivision of any such association or party."

12.    However, under Subsection (d), "if such person establishes that such membership or affiliation is or was involuntary . . . or that such membership or affiliation is or was by operation of law, or was for purposes of obtaining employment, food rations, or other essentials of living and where necessary for such purposes." 8 U.S.C. § 1424(d).

13.    Such membership or affiliation will not preclude a person's eligibility for naturalization, moreover, if it was not "meaningful." *Gastelum-Quinones,* 374 U.S. at 471; *Rowoldt v. Perfetto,* 355 U.S. 115, 120 (1957). *See also Galvan v. Press*, 347 U.S. 522, 527–29 (1954) (interpreting the scope of requisite association intended by Congress). Furthermore, the Supreme Court emphasized that the "meaningful association" requirement should not be interpreted narrowly. *Rowoldt*, 355 U.S. at 120.

14.    In *Gastelum-Quinones*, the Court made the following distinction:

> [T]here is a great practical and legal difference between those who firmly attach themselves to the Communist party being aware of all of the aims and purposes attributed to it, and those who temporarily join the Party, knowing nothing of its international relationships and believing it to be a group solely trying to remedy unsatisfactory social or economic conditions, carry out trade-union objectives, eliminate racial discrimination, combat  unemployment, or alleviate distress and poverty.

374 U.S. at 473.

15.    In *Gastelum-Quinones*, the noncitizen was a due-paying member of the Communist Party for around two years, attended fifteen party meetings, one executive meeting, and one area convention. *Id.* at 474. Yet the Supreme Court concluded that the evidence was "extremely insubstantial in demonstrating the 'meaningful' character of petitioner's association with the Party." *Id.* at 476-78.

16.     In *Rowoldt v. Perfetto*, the noncitizen was a due-paying member of the Communist Party for approximately one year. 355 U.S. 115 at 117. He attended Party meetings and, through his party membership, secured a job as a salesman at a Communist Party-run bookstore identified as an "official outlet for communist literature." *Id.* at 118. Still, the Court found "his 'affiliation' with the Communist Party may well have been wholly devoid of any 'political' implications." *Id.* at 120.

17.     District courts have applied the "meaningful association" test to naturalization applicants. *See Mingyu Zhu v. Miller*, No. 3:19-cv-00035-AC, 2020 WL 1330235 (D. Or. Feb. 3, 2020); *In Re Pruna*, 286 F. Supp. 861, 862-63 (D.P.R. 1968).

## CONCLUSIONS

18.     The CCP is a "Communist or other totalitarian party" of any foreign state, within the meaning of 8 U.S.C. § 1424(a)(2)(D).

19.     The CYL is a section, subsidiary, branch, affiliate, or subdivision of the CCP within the meaning of 8 U.S.C. § 1424(a)(2)(E).

20.     The Government has not proven by clear and convincing evidence that Wang was a member of or affiliated with the CCP.

21.     Wang was not meaningfully associated with the CCP or any other totalitarian party.

22.     Wang was not meaningfully associated with the CYL.

23.     Wang is not and has never been a member of the CCP.

24.     Wang's compulsory membership in the CYL is not an affiliation with the CCP.

## COUNT II — ILLEGAL PROCUREMENT OF NATURALIZATION – LACK OF GOOD MORAL CHARACTER: FALSE TESTIMONY

### APPLICABLE LAW

25.     To be eligible for naturalization under 8 U.S.C. § 1440, an applicant must show that

he has been a person of good moral character for the period beginning one year before the date on which he files his Form N-400, and continuing until the time he takes the Oath of Allegiance and becomes a naturalized United States citizen. 8 C.F.R. § 329.2(d).

26.    A person who has provided false testimony for the purpose of obtaining immigration benefits is statutorily precluded from being able to establish good moral character. 8 U.S.C. § 1101(f)(6).

27.    For false testimony to be considered a bar to good moral character, it must be oral testimony under oath; written statements alone are insufficient. *Kungys*, 485 U.S. at 780; *Beltran-Resendez v. INS*, 207 F.3d 284, 287 (5th Cir. 2000).

28.    The false testimony must also be accompanied with subjective intent of the declarant to obtain immigration or naturalization benefits through their dishonesty. *See Kungys*, 485 U.S. at 780.

29.    Under 8 U.S.C. § 1101(f)(6), false testimony does not need to be material to find that a person lacked good moral character. *Kungys*, 485 U.S. at 780.

30.    The false testimony provision "denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits." *Id.*; *see also* 8 C.F.R. § 316.10(b)(2)(vi).

31.    Section 1101(f)(6) does not include a materiality requirement because its "primary purpose" is to identify persons who lack good moral character, rather than to prevent "false pertinent data from being introduced into the naturalization process." *Kungys*, 485 U.S. at 780.

32.    The Supreme Court has noted that "lack of good moral character" "appears to some degree whenever there is a subjective intent to deceive, no matter how immaterial the deception."

*Id.*

**CONCLUSIONS**

33.    The Government was required to establish that Wang lacked good moral character from May 11, 2015, through May 11, 2016, the day on which he submitted his Form N-400, and up until he took the Oath on July 14, 2016.

34.    The Government has not established by clear and convincing evidence that Wang provided false testimony for the purpose of obtaining an immigration benefit on June 28, 2016, within the good moral character period, when he was interviewed under oath in connection with his Form N-400.

35.    The Government did not prove by clear and convincing evidence that Wang was not of good moral character.

## COUNT III — ILLEGAL PROCUREMENT OF NATURALIZATION – LACK OF GOOD MORAL CHARACTER: UNLAWFUL ACTS

**APPLICABLE LAW**

36.    Congress created a "catch-all" good moral provision, which states, "[t]he fact that any person is not within any of the foregoing classes [of ineligibility] shall not preclude a finding that for other reasons such person is or was not of good moral character." 8 U.S.C. § 1101(f).

37.    An applicant for naturalization is precluded from establishing the good moral character necessary to naturalize where he committed unlawful acts during the statutory period that adversely reflected on his moral character, and there were no extenuating circumstances. *See id.*; 8 C.F.R. § 316.10(b)(3)(iii).

38.    In other words, a person who commits unlawful acts during the good moral character time period is ineligible to naturalize unless there are extenuating circumstances. 8 C.F.R. § 316.10(b)(3)(iii).

39.     "Extenuating circumstances are those which render a crime less reprehensible than it otherwise would be, or tend to palliate or lessen its guilt." *U.S. v. Suarez*, 664 F.3d 655, 662 (7th Cir. 2011).

40.     It is the defendant's burden to identify and prove extenuating circumstances. *See* § 316.10(b)(3) ("Unless the applicant establishes extenuating circumstances"); *United States v. Dave*, No. 13-CV-8867, 2015 WL 5590696 at *3 (N.D. Ill. Sept. 21, 2015), *aff'd*, 652 F. App'x 468 (7th Cir. 2016).

## CONCLUSIONS

41.     The Government has not proven by clear and convincing evidence that on April 27, 2016, and June 28, 2016, Wang committed any of the following unlawful acts.

### *False Swearing in an Immigration Matter*

42.     The Government has not proven by clear and convincing evidence that Wang knowingly made false statements with respect to material facts in the Form N-400 in violation of 18 U.S.C. § 1001.

43.     The Government has not proven by clear and convincing evidence that Wang's statement that he had never been involved in or in any way associated with any association fund, foundation, party, club, society, or similar group in the United States or in any other location in the world was knowingly false because he did not think that is involuntary mandatory membership in the CYL counted.

44.     The Government has not proven by clear and convincing evidence that Wang's statement that he had never received military or weapons training was false, knowingly or otherwise.

45.     The Government has not proven by clear and convincing evidence that Wang's

statement that he had never received military or weapons training was about a material fact.

46.     The Government has not proven by clear and convincing evidence that Wang's response that he had never committed a crime for which he was not arrested was false, knowingly or otherwise.

47.     The Government has not proven by clear and convincing evidence that Wang was not eligible for an F-1 student visa in 2015.

48.     The Government has not proven by clear and convincing evidence that Wang's statement that he had never given any U.S. Government officials any information or documentation that was false, fraudulent, or misleading, or that he had never lied to any U.S. Government officials to gain entry or admission into the United States or to gain immigration benefits while in the United States, was false, knowingly or otherwise.

49.     There is no evidence, let alone clear and convincing, that Wang's statement that he was willing to take the full Oath was false.

### *Making False Statements*

50.     The Government has not proven by clear and convincing evidence that Wang willfully and knowingly made or caused to be made materially false, fictitious, and fraudulent statements in the Form N-400 in violation of 18 U.S.C. § 1001.

### *Perjury*

51.     The Government has not proven by clear and convincing evidence that Wang willfully subscribed as true any material matter which he did not believe to be true on the Form N-400 in violation of 18 U.S.C. § 1621(1).

52.     The Government has not proven by clear and convincing evidence that Wang ever committed any unlawful acts that would preclude him from naturalization.

53.     Even if an unlawful act were committed, there are extenuating circumstances that would preserve Wang's good moral character.

## COUNT IV — PROCUREMENT OF UNITED STATES CITIZENSHIP BY CONCEALMENT OF A MATERIAL FACT OR WILLFUL MISREPRESENTATION

### APPLICABLE LAW

54.     Citizenship can be revoked if procured by concealing a material fact or by willful misrepresentation. 8 U.S.C. § 1451(a).

55.     The Supreme Court has held that this ground contains four independent requirements: "[1] the naturalized citizen must have misrepresented or concealed some fact, [2] the misrepresentation or concealment must have been willful, [3] the fact must have been material, [4] and the naturalized citizen must have procured citizenship as a result of the misrepresentation." *Kungys*, 485 U.S. at 767.

56.     The element of willfulness is satisfied by a finding that the misrepresentation was deliberate and voluntary. *See Witter v. I.N.S.*, 113 F.3d 549, 554 (5th Cir. 1997) ("The element of willfulness is satisfied by a finding that the misrepresentation was deliberate and voluntary . . . . Proof of an intent to deceive is not required; rather, knowledge of the falsity of the representation is sufficient."). The government need not demonstrate that the applicant had a specific intent to deceive the decisionmaker. *See id.* Rather, knowledge that the information is false suffices to establish willfulness. *See id.*

57.     The test for materiality is whether the concealments or misrepresentations had a "natural tendency to influence the decisions" of the agency adjudicating the application. *Kungys*, 485 U.S. at 772 ("[T]he test of whether Kungys' concealments or misrepresentations were material is whether they had a natural tendency to influence the decisions of the [adjudicators].").

58.     The test for "procurement" is whether it is "fair to infer that the citizen was actually ineligible" for naturalization. *See Latchin*, 554 F.3d at 714. The government need not eliminate every other potential inference, it need only show that it is "fair to infer" that the defendant was ineligible.

CONCLUSIONS

59.     The Government has not proven by clear and convincing evidence that Wang concealed or willfully misrepresented material facts that resulted in the procurement of his citizenship.

## CONCLUSION

The Clerk of the Court shall render judgment in accordance with the above Findings and Conclusions in favor of Defendant Chengyu Wang.

**SIGNED** this 29th day of September, 2023.

_____
ORLANDO L. GARCIA
United States District Judge

39

[1] Gov.'s Ex. 27 (Enlistment Contract) at ¶ 3a.; Trial Tr. Vol. I (*Wang*) at 168:20–22 (recognizing that MAVNI was a Department of Defense recruiting program).
[2] Joint Stipulations at ¶ 34, Dkt. No. 86.
[3] Stip. at ¶ 32; Gov.'s Ex. 11 (MAVNI Information Paper) at 1.
[4] Stip. at ¶ 33; Gov.'s Ex. 11 (MAVNI Information Paper) at 1.
[5] 8 U.S.C. § 1440(a).
[6] Stip. at ¶ 36.
[7] *Id.* at ¶ 37.
[8] *Id.* at ¶ 38.
[9] *Id.* at ¶ 39 (citing *MAVNI Program Status for Fiscal Year 2017*, ICE (Dec 2, 2016)).
[10] *Id.* at ¶ 82.
[11] *Id.* at ¶ 14.
[12] *Id.* at ¶ 16; Tr. Vol. I (*Wang*) at 123:21–22.
[13] Tr. Vol. I (*Wang*) at 123:12–14.
[14] *Id.* at 124:25–125:7.
[15] Tr. Vol. II (*Prof. Shambaugh*) at 35:19–20, 101:24–102:3.
[16] Stip. at ¶ 18.
[17] *See* Tr. Vol. I (Wang) at 129:5-8.
[18] *Id.* at 129:11–17.
[19] *Id.* at 131; Tr. Vol. III (*Agt. Merchant*) at 20:10–22.
[20] Tr. Vol. I (*Wang*) at 131:3–24.
[21] *Id.* at 132:19–23; *see also* Tr. Vol. III (*Agt. Merchant*) at 20:10–22.
[22] Stip. at ¶ 23.
[23] *Id.* at ¶¶ 24, 26.
[24] *Id.* at ¶ 25.
[25] Tr. Vol. I (*Wang*) at 165:6–9.
[26] Stip. at ¶ 27; Gov.'s Ex. 8 (Brown University Diploma); Gov.'s Ex. 9 (Letter from Brown University President).
[27] Stip. at ¶ 28.
[28] D.'s Ex. 4 (Forms for Employment Authorization and Optional Practical Training); Tr. Vol. I (*Agt. Dezern*) at 107:15–19.
[29] Tr. Vol. II (*Sgt. Derrick*) at 120:1–2.
[30] Stip. at ¶ 29; Tr. Vol. II (*Sgt. Derrick*) 120:7, Dkt. No. 113; Tr. Vol. III (*Sgt. Marte*) 64:2–15, Dkt. No. 115.
[31] Tr. Vol. II (*Sgt. Derrick*) at 120:25–121:2; Tr. Vol. III (*Sgt. Marte*) at 65:1–9.
[32] Gov.'s Ex. 10 (Letter of Intent to Enlist); Tr. Vol. I (*Wang*) at 168:7–15; Stip. at ¶ 30.
[33] Gov.'s Ex. 10 (Letter of Intent to Enlist).
[34] Tr. Vol. I (*Wang*) at 168:23–169:8; Gov.'s Ex. 11 (MAVNI Information Paper) at 1–8; Tr. Vol. III (*Sgt. Marte*) 95:2–4.
[35] Gov.'s Ex. 11 (MAVNI Information Paper).
[36] Gov.'s Ex. 12 (Statement for Enlistment).
[37] *Id.* at 1.
[38] *Id.*
[39] *Id.*
[40] *Id.* at 2.
[41] Tr. Vol. III (*Sgt. Marte*) at 81:4–7.
[42] *Id.* at 81:16–18.
[43] *Id.* at 93:10–13.
[44] Gov.'s Ex. 15 (SF-86).
[45] Stip. at ¶ 41.

[46] *Id.* at ¶ 42.
[47] *Id.* at ¶ 43.
[48] *See* Tr. Vol. II (*Sgt. Derrick*) at 147:14-20.
[49] *See id.* at 150:19–153:11.
[50] *Id.* at 148:9–12.
[51] *Id.* at 161:25–162:3.
[52] *Id.* at 162:4–10.
[53] *Id.* at 153:24–154:15; *See* Gov.'s Ex. 15 (SF-86) at 5.
[54] *Id.* at 154:20–23.
[55] *Id.* at 155:9–14; *See* Gov.'s Ex. 15 (SF-86) at 13.
[56] *Id.* at 148:13–18; Gov.'s Ex. 15 (SF-86) at 6.
[57] *Id.* at 162:11–16; *see also* Gov.'s Ex. 15 (SF-86) at 21.
[58] *Id.* at 153:12–23.
[59] *See, e.g., id.*
[60] *Id.* at 147:11–13.
[61] Stip. at ¶ 47.
[62] Tr. Vol. I (*Wang*) at 190:5–24.
[63] *Id.* at 193:6–20.
[64] *Id.* at 195.
[65] *Id.* at 194:14–195:20.
[66] Stip. at ¶¶ 48–49. *See* D.'s Ex. 8 (Zhejiang Academic Records).
[67] Tr. Vol. II (*Sgt. Derrick*) at 146:9–11.
[68] *Id.* at 123:12–15; *see* Stip. at ¶ 50.
[69] *Id.* at 122:20–123:15.
[70] *Id.* at 145:20–146:8.
[71] D.'s Ex. 8 (Zhejiang Academic Records); Stip. at ¶ 49.
[72] *See* D.'s Ex. 8 (Zhejiang Academic Records).
[73] Tr. Vol. II (*Sgt. Derrick*) at 145:15–146:11, 123:15–16.
[74] Stip. at ¶ 46.
[75] Tr. Vol. II (*Sgt. Derrick*) at 159:20–160:20.
[76] *Id.* at 160:20–24.
[77] Gov.'s Ex. 15 (SF-86) at 5.
[78] *Id.* at 6.
[79] Tr. Vol. II (*Sgt. Derrick*) at 178:7–11; Tr. Vol. III (*Sgt. Marte*) at 78:6–12
[80] Stip. at ¶ 52.
[81] Tr. Vol. III (*Sgt. Marte*) at 83:12–19; Gov.'s Ex. 11 (MAVNI Information Paper).
[82] Tr. Vol. II (*Sgt. Derrick*) at 177:9–13; Tr. Vol. III (*Sgt. Marte*) at 83:8–11.
[83] Tr. Vol. I (*Wang*) at 198:6–16; Stip. at ¶ 58 ("[Wang] was physically in the United States when he electronically submitted the Form DS-160.").
[84] Tr. Vol. I (*Wang*) at 199:13–21; Stip. at ¶ 57 ("[Wang] represented in the Form DS-160 that Shenyang, China was the '[l]ocation where [he] will be submitting [his] application.'") (first alteration added).
[85] Stip. at ¶ 56.
[86] Tr. Vol. I (*Wang*) at 200:9–20, 201:4–9.
[87] *Id.* at 199:22–200:3.
[88] *Id.*
[89] *Id.* at 201:11–20.
[90] Stip. at ¶ 59.
[91] Tr. Vol. I (*Wang*) at 203:17–19.
[92] 8 C.F.R. § 214.2(f)(10)(ii)*; see* D.'s Ex. 4 (Forms for Employment Authorization and Optional Practical Training).
[93] *See* D's Ex. 4 (Forms for Employment Authorization and Optional Practical Training).

[94] Stip. at ¶¶ 60–61.
[95] *See* D.'s Ex. 4 (Forms for Employment Authorization and Optional Practical Training).
[96] Stip. at ¶ 62.
[97] *See* D.'s Ex. 13 (Form I-94); Stip. at ¶ 63 ("On or about January 22, 2016, [Wang] was admitted to the United States on the basis of the F-1 student visa.").
[98] Gov.'s Ex. 11 (MAVNI Information Paper) at 2 (emphasis added); *see* Trial Tr. Vol. I (Wang) at 169:18–24.
[99] Gov.'s Ex. 11 (MAVNI Information Paper) at 3 (emphasis added).
[100] *Id.*; Tr. Vol. I (Wang) at 172:19–25.
[101] Tr. Vol. I (Wang) at 171:19–25.
[102] *Id.* at 171:24–172:3.
[103] *See id.*
[104] *Id.* at 170:12–13.
[105] *Id.* at 197:24–198:5; Stip. at ¶¶ 60, 63; Gov.'s Ex. 27 (Enlistment Contract) at 4.
[106] Gov.'s Ex. 27 (Enlistment Contract) at 1, 4.
[107] *Id.* at 1.
[108] *Id.* (emphasis added).
[109] *Id.*
[110] *See id.*
[111] Tr. Vol. II (*Schwartz*) at 244:11–14; Stip. ¶ 65 ("As required by the MAVNI program, [Wang] applied to become a naturalized citizen.").
[112] D.'s Ex. 17 (N-426) at 2, 3; Tr. Vol. II (*Schwartz*) at 245:19–21.
[113] D.'s Ex. 17 (N-426) at 2, 3; Tr. Vol. II (*Schwartz*) at 245:19–21.
[114] D.'s Ex. 17 (N-426) at 2.
[115] Tr. Vol. II (*Sgt. Derrick*) at 181:2–8.
[116] *Id.* at 181–182.
[117] *Id.* at 180:20–23.
[118] *Id.* at 181:17–22.
[119] *Id.* at 182:12–18.
[120] Stip. at ¶ 66.
[121] Stip. at ¶¶ 76, 81.
[122] Tr. Vol. II (*Schwartz*) at 201:24–202:2, 203:2–3.
[123] *Id.* at 237:2–3, 14–21.
[124] *Id.* at 203:16–18, 203:24–205:1, 215:10–11
[125] *Id.* at 206:18–24.
[126] *Id.* at 207:18–20, 213:7–12.
[127] *Id.* at 228:23–229:9.
[128] *Id.* at 229:14–230:11.
[129] *Id.* at 233:21–25.
[130] *Id.* at 234:6–11; Gov.'s Ex. 18 (N-400).
[131] Tr. Vol. II (*Schwartz*) at 234:18–23.
[132] *See* Endnotes, supra, at 130–31.
[133] Stip. at ¶ 77.
[134] Tr. Vol. II (*Schwartz*) at 219:7–12.
[135] *Id.* at 230:20–231:9.
[136] *Id.* at 232:11–13.
[137] *Id.* at 238:18–20.
[138] Stip. at ¶ 79.
[139] Tr. Vol. II (*Schwartz*) at 220:13–19, 233:9–11.
[140] Stip. at ¶ 68.
[141] Tr. Vol. II (*Schwartz*) at 220:21–221:1; Gov. Ex. 18 (N-400) at 13.

[142] Tr. Vol. I (*Wang*) at 132:19–23.
[143] *See* Endnotes, supra, at 12–15.
[144] *See generally* Dkt. No. 1.
[145] Stip. at ¶ 69.
[146] Gov.'s Ex. 18 (N-400) at 13.
[147] Tr. Vol. I (*Wang*) at 219:23–220:1, 220:7–18
[148] *Id.* at 220:19–23
[149] *Id.* at 207:20–25.
[150] *Id.* at 208:5–10; *see id.* 129:11-17.
[151] Stip. at ¶ 70.
[152] Gov.'s Ex. 18 (N-400) at 15.
[153] D.'s Ex. 8 (Zhejiang Academic Records).
[154] *See* Stip. at ¶ 101; Tr. Vol. I (*Wang*) at 127:24–128:4.
[155] Tr. Vol. II (*Schwartz*) at 257:8–17.
[156] *Id.* at 234:6–11.
[157] Stip. at ¶ 71.
[158] Gov.'s Ex. 18 (N-400) at 15.
[159] Tr. Vol. II (*Schwartz*) at 238:21–239:3.
[160] *Id.* at 239:4–7.
[161] *Id.* at 239:8–23
[162] *See* D.'s Ex. 4 (Forms for Employment Authorization and Optional Practical Training); Tr. Vol. I (*Agt. Dezern*) at 107:15–19.
[163] Stip. at ¶¶ 59–60, 63; Gov.'s Ex. 27 (Enlistment Contract) at 4.
[164] *See* Findings, supra, at 163.
[165] *See* Findings, supra, at 163–64.
[166] Stip. at ¶ 72.
[167] *See* Endnotes, supra, at 158–65.
[168] Stip. at ¶ 73.
[169] *See* Endnotes, supra, at 158–65.
[170] Stip. at ¶ 74.
[171] Tr. Vol. I (*Wang*) at 213:5–7, 214:6–8.
[172] Stip. at ¶ 78.
[173] *Id.* at ¶ 80.
[174] *See* Tr. Vol. II (*Schwartz*) at 227:5-16.
[175] Stip. at ¶ 82.
[176] *Id.* at ¶ 86.
[177] *Id.* at ¶ 85.
[178] *Id.* at ¶ 87.
[179] *Id.* at ¶ 88.
[180] Tr. Vol. III (*Agt. Merchant*) at 8:16–21, 8:25–9:4.
[181] *Id.* at 8:1–6.
[182] *Id.* at 46:9–19.
[183] *Id.* at 9:8–16.
[184] *Id.* at 18:15–19.
[185] *Id.* at 9:21–23.
[186] *Id.* at 9:24–10:9.
[187] Stip. at ¶ 83.
[188] *Id.* at ¶ 90; Tr. Vol. I (Wang) at 139.
[189] D.'s Ex. 23 (CI Questionnaires); Gov. Ex. 20 (List of Relatives and Associates); Tr. Vol. III (*Agt. Merchant*) at 25:10–21.
[190] Tr. Vol. III (*Agt. Merchant*) at 39:1–12.

191 Stip. at ¶ 91.
192 D.'s Ex. 23 (CI Questionnaires); Tr. Vol. I (*Wang*) at 139:23–140:22 (listing that his father worked at China Shipping) & 142:8–147:4 (listing names of contacts and relevant positions within CCP).
193 Gov.'s Ex. 20 (List of Relatives and Associates); Tr. Vol. III (*Agt. Merchant*) at 29:21–30:1.
194 Tr. Vol. I (*Wang*) at 147:13–20.
195 Tr. Vol. III (*Agt. Merchant*) at 53:6–10.
196 *Id.* at 54:5–10.
197 *Id.* at 38:13–20
198 *Id.* at 52:23–53:10.
199 Stip. at ¶ 92.
200 *Id.* at ¶ 93.
201 *Id.* at ¶ 94.
202 Tr. Vol. III (*Agt. Merchant*) at 43:2–7.
203 Stip. at ¶ 96.
204 *Id.* at ¶ 97.
205 *Id.* at ¶ 98.
206 *Id.* at ¶ 99.
207 *Id.* at ¶ 100.
208 *Id.* at ¶ 101.
209 Tr. Vol. I (*Agt. Dezern*) at 94:4–12, 20–22.
210 Stip. at ¶ 103.
211 *Id.* at ¶ 104.
212 Tr. Vol. I (*Agt. Dezern*) at 87:1–3, 21–23.
213 *See generally* Gov.'s Exs. 7, 21 (WeChats).
214 Tr. Vol. III (*Prof. Bourgerie*) at 5:4–6:7, Dkt. No. 114.
215 *Id.* at 8:1–20.
216 Tr. Vol. I (*Agt. Dezern*) at 86:1–22.
217 Stip. at ¶ 1.
218 *See* 8 U.S.C. § 1440(c).
219 Stip. at ¶ 2.
220 *Id.* at ¶ 3a–e.
221 *Id.* at ¶ 4.
222 *Id.* at ¶ 5.
223 *Id.* at ¶ 6.
224 *Id.* at ¶ 7a–e.
225 *See, e.g.,* D.'s Ex. 25 (Record of ASB Hearing) at 2–3.
226 Stip. at ¶ 8; Tr. Vol. I (*Agt. Dezern*) at 88:5–7.
227 Stip. at ¶ 9; *see* Tr. Vol. I (*Agt. Dezern*) at 88:5–7.
228 Stip. at ¶ 10.
229 D.'s Ex. 26 (DD-214); Tr. Vol. I (*Agt. Dezern*) at 81:8–10.
230 Stip. at ¶ 11.
231 *Id.* at ¶ 12.
232 *Id.* at ¶ 13.
233 *Compare* D.'s Ex. 25 (Record of ASB Hearing) *with* Compl., Dkt. No. 1; Tr. Vol. I (*Agt. Dezern*) at 88:5–9.
234 Compl. at ¶¶ 67–77.
235 *Id.* at ¶¶ 78–96.
236 *Id.* at 18–21.
237 *Id.* at 21–23.
238 Dezern Aff., Dkt. No. 1-2.
239 Compl. at 14–23.